**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED

DEC 1 9 2001

JUDGE MATTHEW F. KENNELLY
UNITED STATES DISTRICT COURT

| | |
|---|---|
| **ROBERT P. HOWINGTON, III,** | ) |
| | ) |
| **Plaintiff,** | ) **No. 00 C 7394** |
| | ) |
| **vs.** | ) **Honorable Matthew Kennelly** |
| | ) |
| **MATTHEW GHOURDJIAN, RICHARD C. FINKELMAN, and DIGITAL CONVERGENCE CORPORATION, a Delaware corporation, successor to DIGITAL CONVERGENCE, LLC, a Delaware limited liability company, and now known as CEIRA TECHNOLOGIES, INC., a Delaware corporation,** | ) |
| | ) |
| **Defendants.** | ) |

DOCKETED

DEC 27 2001

**PLAINTIFF'S MEMORANDUM OF LAW SUPPORTING DERIVATIVE CLAIMS CONTAINED IN COUNT V OF SECOND AMENDED COMPLAINT**

Pursuant to this Court's Order of November 2, 2001, plaintiff, Robert P. Howington, III, through his attorneys, and on behalf of the shareholders of SellSignal.com, Inc. ("SellSignal"), hereby submits his memorandum of law supporting the derivative claims of SellSignal.

## INTRODUCTION

The "derivative phase" of this case presents the issue as to whether defendants have met their burden of showing the "entire fairness" of the December 10, 1999 Services Agreement and undated, open-ended Convertible Loan and Security Agreement, both as to fair dealing and fair price. Defendants have failed to carry their burden of "entire fairness" because the Services Agreement and Convertible Loan and Security Agreement were never submitted to, or voted on, by SellSignal's Board of Directors. These unauthorized transactions were forced upon SellSignal -- a company

powerless to refuse the demand. SellSignal was a helpless captive of defendants Finkelman and Ghourdjian who, without Board authority, formalized the terms of the Services Agreement and Convertible Loan and Security Agreement leaving key terms blank in order to allow Digital to deprive SellSignal of any profit in the transactions and transfer all revenues to defendant Digital and its affiliated companies. Moreover, Finkelman's and Ghourdjian's failure to obtain any form of Board authorization for these transactions renders them not just unfair, but void *ab initio*.

A second issue of law presented is whether the shareholder ratification attempted in this case is effective given that the attempt was made 18 months after the transactions were "agreed to," eight months after Howington filed this suit, and was not preceded by a board decision. Delaware's ratification statute, by its plain terms, applies where an interested director "is present at or participates in the meeting of the board or committee which authorizes the contract or transaction." 8 *Del. C.* § 144(a). Finally, although this Court need not reach the merits of defendants' attempted ratification, it was invalid because: (1) it did not fully and accurately provide sufficient information for an informed vote by the shareholders; and (2) was not voted upon by a sufficient number of "disinterested shareholders."

## STATEMENT OF FACTS

### SellSignal's December 1, 1999 Board of Directors Meeting (PX 8)

At the first meeting of SellSignal's Board of Directors, held December 1, 1999, Ghourdjian, purportedly "recused" himself as a SellSignal director and participated telephonically as sole managing member and President of defendant Digital. (PX 8; Finkelman, Tr. 150, 167.)[1] At the meeting, Ghourdjian made the following demand on SellSignal on behalf of Digital:

---

[1]Citations to "PX" refer to Plaintiff's Trial Exhibits.

> I had a bigger company I was running. If you want my help, here are two things that Digital will do . . . Digital will invest if it has a note secured by the technology. Digital will invest if it gets stock. That's it. If you want to raise money, go elsewhere. Please go do it. Go talk with other investors. But those are the terms under which Digital will invest, and I hung up the phone.

(Tr. 298-99; *Defs.' Motion to Finalize*, ¶ 14.)

SellSignal's Board had sole authority to give Ghourdjian a note secured by SellSignal's technology and/or SellSignal stock. Thus, because of Ghourdjian's alleged recusal, Director Howington, a founder and SellSignal shareholder, and defendant Richard Finkelman, also a founder and Digital employee earning an annual salary of approximately $130,000, plus stock options, were vested with the authority, as a Board, to accept or reject Ghourdjian's demand on behalf of Digital. (PX 23; Finkelman, Tr. 155-56, 222-23.)

After Ghourdjian hung-up the phone, no agreement was reached at the meeting with regard to Ghourdjian's demands on SellSignal. (Ghourdjian, Tr. 298-99.) The Minutes of the meeting, although noting that the subject of SellSignal's financing had been raised, reflected no votes by Finkelman or Howington in favor of any agreements with Digital. (PX 8.)

**The Services Agreement (PX 10)**

Despite the lack of Board agreement or even discussion, 9 days later, on or about December 10, 1999, Finkelman took the first of three acts on SellSignal's behalf, in acquiescing to Ghourdjian's demands of December 1: executing the Services Agreement between SellSignal and Digital. (PX 10; Finkelman, Tr. 163, 165, 171.) Without shopping for competitors, Finkelman executed, with blanks, the Services Agreement obligating SellSignal to pay Digital for services. (PX 10; Finkelman, Tr. 173-74.) The Services Agreement left blank key terms such as price quotes

and hourly rates, which were intentionally not negotiated. (PX 10; Finkelman, Tr. 174.) This open-ended structure eliminated any arms-length restraint on Digital, leaving Digital free to bill SellSignal at will. Finkelman granted Digital unbridled discretion despite Ghourdjian's own admission that Digital's economic interests were sufficiently adverse to SellSignal. Specifically, Ghourdjian through his attempted recusal had knowledge that he could not participate in SellSignal Board meetings to the extent Digital-SellSignal transactions were discussed. Although this contract, signed by Finkelman as SellSignal's President and Ghourdjian as Digital's President, was required under SellSignal Bylaws and Delaware law to be authorized by a vote of the Board of Directors, a meeting of the Board did not occur. (PX 8; Finkelman, Tr. 164-65.)

**The Digital Loan (PX 38)**

Presumably in late December, 1999, Finkelman engaged in another unauthorized act in response to Ghourdjian's demand: executing a Convertible Loan and Security Agreement ("Digital Loan"). (PX 38; Finkelman, Tr. 202.) Like the Services Agreement, the Digital Loan was signed by Finkelman as SellSignal's President and Ghourdjian as Digital's President. (PX 38; Finkelman, Tr. 202.) Finkelman bound SellSignal to the terms of the Digital Loan without Board approval. (PX 8.) Also like the Services Agreement, the Digital Loan was an "open-ended" document that left key terms blank, such as the servicer itself, the effective date, the loan amount, repayment commencement or termination dates, and the interest rate to be paid on the outstanding balance. (PX 38; Finkelman, Tr. 201-02.) However, it did secure SellSignal's payments to Digital by granting Digital a security interest in SellSignal's intellectual property. (PX 38.) Similarly, the Digital Loan was intentionally not negotiated, thereby removing any contractual structure that might constrain Digital's ability to create SellSignal debt.

Neither the Services Agreement nor the Digital Loan, nor any of Digital's monthly invoices were disclosed to the Board. These unauthorized transactions did not surface until after this litigation was filed. However, documents prepared by defendants illustrate that during the year 2000, $550,000 in charges were billed to SellSignal by Digital pursuant to the Services Agreement. (PX Group 25.) SellSignal's growing debt to Digital was concealed from the Board.

**Wells Fargo (PX 14 and PX 20)**

A Letter of Intent was entered into between SellSignal and Wells Fargo on August 30, 2000. (PX 14; Finkelman, Tr. 190.) The Letter of Intent between SellSignal and Wells Fargo was executed by Richard Finkelman as Chief Executive Officer of SellSignal but without Board approval. (PX 14; Finkelman, Tr. 191.) Notwithstanding the fact that Digital was not a signatory to the Letter of Intent, the Letter of Intent provided SellSignal a $200,000 deposit subject to Digital's purported rights under the Services Agreement and Digital Loan. (PX 14; Finkelman, Tr. 205-06.)

Thereafter, the Wells Fargo Agreement was executed on or about April 12, 2001 by SellSignal, Digital, and Wells Fargo with an effective date of September 1, 2000. (PX 20.) Finkelman signed the Wells Fargo Agreement as President of SellSignal and Ghourdjian signed as Chief Executive Officer of Digital. (PX 20.) Although Digital was a signatory to the Wells Fargo Agreement, all development and license fees were not received directly by Digital, but rather SellSignal. Similar to the Letter of Intent, there was no Board approval by SellSignal's Board of Directors prior to the Wells Fargo Agreement being entered into on or about April 12, 2001.

**Howington's Lawsuit and Removal (PX Group 16)**

On November 22, 2000, Howington filed his Original Complaint alleging, *inter alia*, that Finkelman and Ghourdjian breached their fiduciary duties as officers and directors of SellSignal. Thereafter, a Special Meeting of the SellSignal Shareholders was held on January 5, 2001. (PX Group 16; Finkelman, Tr. 198.) The purpose of the January 5, 2001 Special Meeting of SellSignal's Shareholders was to remove Howington from SellSignal's Board of Directors. (Finkelman, Tr. 199.) On January 5, 2001, pursuant to an Action by Written Consent of the Directors in lieu of a meeting of the Board of Directors of SellSignal, Howington was removed as a director and removed from the office of Executive Vice President of SellSignal. (PX Group 16; Finkelman, Tr. 99, 199.)

**Stock Option Agreements (PX 21 and PX 22)**

SellSignal, by Richard Finkelman as President of SellSignal, granted a stock option to Matthew Ghourdjian as of May 23, 2001 in the amount of 32,000 shares. (PX 22; Finkelman, Tr. 221.) SellSignal, by Matthew Ghourdjian as Treasurer of SellSignal, granted a stock option to Richard Finkelman as of May 23, 2001 in the amount of 32,000 shares. (PX 21; Finkelman, Tr. 220-21.) Neither of the Stock Option Agreements were approved or disclosed at a SellSignal Board meeting, nor in the subsequent letter to shareholders seeking ratifications of the agreements with shareholders. (PX 27.) These unauthorized transactions did not surface until pre-trial discovery in this litigation.

**Attempted Ratification (PX 27)**

On July 27, 2001, Richard Finkelman as CEO of SellSignal, sent a letter to all SellSignal Shareholders (PX 27; Finkelman, Tr. 223-224), soliciting their ratification of the original December 10, 1999 Services Agreement (PX 10), but not the original and undated Digital Loan (PX

38). Finkelman included in the July 27, 2001 letter to SellSignal Shareholders copies of the following: Action by Written Consent of the Stockholders of SellSignal.com, Inc.; Services Agreement; SellSignal-Digital Convergence Convertible Loan and Security Agreement (dated February 20, 2001); SellSignal-Digital Convergence Convertible Secured Promissory Note (dated February 20, 2001); and a copy of Mr. Howington's Original Complaint. (PX 27.)[2]

Finkelman's July 27, 2001 solicits letter to SellSignal's Shareholders was sent more than a year and a half after the December 1, 1999 SellSignal Board of Directors meeting and the subsequent execution of the original Services Agreement and Digital Loan (PX 27; Finkelman, Tr. 226-27.) Although Shareholders R. Finkelman, H. Finkelman, Gonzalez and Gentling signed the Shareholder Written Consent, R. Finkelman, Gonzalez and Gentling all had been paid and were being paid pursuant to the Services Agreement and H. Finkelman was the father of defendant Finkelman and knew that ratification was being sought to exonerate his son from legal liability. Shareholders Digital, Ghourdjian and Howington did not sign the Written Consent.

## ARGUMENT

## I. THE SERVICES AGREEMENT AND DIGITAL LOAN WERE NOT "ENTIRELY FAIR"

The shareholders challenge the following transactions purportedly entered into by SellSignal:

---

[2]Plaintiff's Exhibit 27, as used at trial, does not contain a copy of the original July 27, 2001 letter to the SellSignal Shareholders containing an alleged mistake, nor were copies of the following attached: Services Agreement; SellSignal-Digital Convergence Convertible Loan and Security Agreement (dated 2/20/01); SellSignal-Digital Convergence Convertible Secured Promissory Note (dated 2/20/01); and a copy of Mr. Howington's Original Complaint. Plaintiff's Exhibit 27 is duplicative of the July 27, 2001 ratification package produced by Sonnenschein Nath & Rosenthal at Bates numbers SS6174-SS6188.

- The Digital-SellSignal Services Agreement (PX 10), and monthly invoices reflecting corporate indebtedness to Digital incurred by SellSignal pursuant thereto (PX 25);
- The Digital-SellSignal Convertible Loan and Security Agreement (PX 38);
- The Stock Option Agreements through which SellSignal, under signature of Finkelman and Ghourdjian, "granted" stock options to Finkelman and Ghourdjian (PX 21 and PX 22).

**A. Defendants Bear The Burden of Showing "Entire Fairness" With Respect to Both Process And Price**

> I had a bigger company I was running. If you want my help, here are two things that Digital will do . . . Digital will invest if it has a note secured by the technology. Digital will invest if it gets stock. That's it. If you want to raise money, go elsewhere. Please go do it. Go talk with other investors. But those are the terms under which Digital will invest, and I hung up the phone.

(Tr. 298-99; *Defs.' Motion to Finalize*, ¶ 14.)

Defendants indisputably stood on "both sides" of the Services Agreement and Digital Loan and they concede that the "entire fairness" standard applies. (*Defs' Motion to Finalize*, ¶¶ 10-14); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993); *Sinclair Oil v. Levien*, 280 A.2d 717, 720 (Del. 1971).[3] The entire fairness standard is a demanding standard. Unlike the Business Judgment Rule, which presumes good faith and insulates director decisions upon a showing of a rational basis, the entire fairness testimony requires "careful scrutiny" and does not defer to the directors. *Nixon v. Blackwell*, 626 A.2d 1366, 1375 (Del. 1993). Defendants, not the shareholders,

---

[3] In cases involving the conduct of conflicted corporate fiduciaries, "The threshold question is the applicable standard by which the defendants should be judged. This is a legal question and therefore subject to *de novo* review [on appeal]." *Nixon v. Blackwell*, 626 A.2d 1366, 1375 (Del. 1993). The jury's general finding that the defendants did not engage in self-dealing, and their failure to undertake an analysis of whether the transactions were "entirely fair," were incorrect as a matter of law.

bear the burden of proof. (*Id.*) Furthermore, the testimony requires a showing of both fair price and fair dealing. (*Defs.' Motion to Finalize,* ¶ 12-14.)[4]

**B. The Services Agreement and Digital Loan Were Not the Product of Fair Dealing**

**1. The Services Agreement and Digital Loan Were Never Brought Before, or Approved by, the SellSignal Board of Directors**

Because defendants are directors of SellSignal, a minimum standard for "fair dealing" would be compliance with SellSignal's Bylaws addressing how the corporation can be validly obligated to contracts and loans. SellSignal Bylaw §3.01[5] vests the Board of Directors, acting as a Board, with sole authority to enter into, or authorize an officer to enter into, contracts (§ 5.01)[6], or incur indebtedness (§ 5.02).[7]

---

[4] *Goodwin v. Live Entertainment*, cited by defendants (*Defs.' Motion to Finalize,* ¶ 6), does not hold to the contrary. In *Goodwin*, which involved a merger, the court held that the defendant "simply did not stand on both sides of this merger," and thus the plaintiff could not overcome the presumption of the Business Judgment Rule and had the burden of proving particularized wrongs such as entrenchment, vote selling, etc. 1999 WL 64265 at * 25. The court recognized that, if a director does stand on both sides of a transaction, then self-interest is presumptively established and the burden shifts to the directors to disprove allegations of self-interested conduct. (*Id.*) This is precisely the framework the Court should apply here.

[5] "Section 3.01: General Powers. The property, business and affairs of the corporation shall be managed by the Board." (PX 1; PX 17.)

[6] "Section 5.01 Execution of Contracts. The Board . . . may authorize any officer or officers, agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation . . . and unless so authorized by the Board or by these Bylaws, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or in any amount." (PX 1; PX 17) (emphasis added).

[7] "Section 5.02 Checks, Drafts, Etc. All Checks, drafts or other orders for payment of money, notes or other evidence of indebtedness, issued in the name of or payable to the Corporation . . . shall be determined by resolution of the Board." (PX 1; PX 17) (emphasis added).

Defendants contend that they complied with their own Bylaws by obtaining Board approval of the Services Agreement and Digital Loan at the SellSignal Board of Directors' Meeting of December 1, 1999. (*Defs' Motion to Finalize*, ¶ 4.) But all evidence is to the contrary. As defendants concede, the Services Agreement and Digital Loan had not even been drafted as of December 1, 1999. (Finkelman, Tr. 175.) The meeting Minutes contain no reference to any "services agreement" or loan between SellSignal and Digital. (PX 8.) Indeed, the word "Digital" appears nowhere in the Minutes. (PX 8.)

The only evidence of Board action taken at the meeting does not support defendants' claims:

> [T]he Board authorized GD&C to prepare a convertible secured promissory note and agreement between Mr. Ghourdjian and SellSignal.com, Inc.

(PX 8) (emphasis added). This excerpt shows Board authorization to "prepare" agreements with Ghourdjian personally. But the Services Agreement and Digital Note were with Digital, not Ghourdjian. As defendants have repeatedly stressed, Ghourdjian and Digital are legally separate entities. (*Digital Mem. In Support of SJ, pp. 7-8.*)[8]

Where minutes of a board meeting conflict with oral testimony, the minutes control. *Young v. Janas*, 103 A.2d 299, 303 (Del. Ch. 1954). The wisdom of that rule is evidenced here. The Court should reject defendants' attempts to contort the plain language of the Minutes, and hold that neither the Services Agreement nor the Digital Note were approved at the Board meeting of December 1, 1999.

---

[8]Indeed, this Court dismissed Digital from Howington's breach of joint venture count, and left in defendant Ghourdjian, based on the fact that they are legally distinct.

### 2. Defendants Never Sought The Unanimous Written Consent of the Directors

Further proof of lack of fair dealing is defendants' contention, apparently in the alternative, that the Services Agreement and Digital Loan were approved during "the course of several de facto Board Meetings, business meetings and telephone conferences between [Finkelman], Mr. Howington and Mr. Ghourdjian." (PX 27.) These allegations, even if taken as true, do not establish valid Board approval of the transactions. SellSignal Bylaws do not provide for "de facto" meetings. (PX 1; PX 17.) SellSignal's Bylaws do provide an alternative to holding a Board meeting: obtaining the unanimous written consent of the directors. (Bylaw § 3.13; 8 *Del. C.* § 141).[9] But defendants did not attempt to comply with this process either.

Interestingly, the *raison d'etre* for the unanimous written consent option was to provide an alternative to formal meetings that precludes the precise type of abuse being attempted by defendants here:

> [T]here will always be situations where prompt action is necessary and the decision is non-controversial, so that approval without a formal board meeting may be appropriate. Under Section 8.21, the requirement of unanimous consent precludes the possibility of stifling or ignoring opposing argument. A director opposed to an action that is proposed to be taken by unanimous consent, or uncertain about the desirability of that action, may compel the holding of a director's meeting to discuss the matter simply by withholding his consent.

*Model Business Corporation Act*, Official Comments to § 8.21(emphasis added). This passage speaks directly to the situation before this Court. Although speculative in nature, it can only be

---

[9]SellSignal Bylaw § 3.13 provides that: "[Board action] may be taken without a meeting if a written consent thereto is signed by all members of the Board . . . and such written consent is filed with the minutes of the Board." (PX 1; 17) (emphasis added). *Accord*, 8 *Del. C.* § 141 ("[A]ny action required or permitted to be taken at any meeting of the board of directors . . . may be taken without a meeting if all members of the Board . . . consent thereto in writing . . . and the writings are filed with the minutes of the Board.") (Emphasis added.)

assumed that defendants' desire to "stifle or ignore" the input of Director Howington was the reason they executed the Services Agreement and Digital Loan without regard to either of the two processes for obtaining Board approval outlined in SellSignal's Bylaws.

### 3. Defendants' Failure to Follow the Processes in SellSignal's Bylaws Prevented Any Consideration of the Interests of the Minority Shareholders

"Where a fair process is the goal, any strategy that protects the minority interests will suffice." *Solomon v. Armstrong*, 747 A.2d 1098, 1113 (Del.Ch. 1999) (emphasis added). Factors to be considered are "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 710. Applying these factors here shows a lack of fairness in every respect:

- The transactions were initiated by individual directors, with conflicts of interest, acting without Board authority.
- The transactions were structured with all critical terms left blank. This structure was intended to give Digital free reign to invoice SellSignal. No aspect of the structure protected the interests of the minority shareholders. Indeed, the normal contract and corporate structures were intentionally avoided.
- The transactions were not negotiated. A director's failure to negotiate, or to allow the adverse party to set the terms of a transaction, is a breach of his fiduciary duty. *Nagy v. Bistricer*, 770 A.2d 43, 62 (Del. Ch. 2000). The "open-ended" structure of both the Services Agreement and the Digital Loan reflect Finkelman and Ghourdjian's decision to not negotiate the critical parameters of the agreements in order to let Digital operate without regard to SellSignal's interests. No negotiations meant defendants could force on SellSignal a blank check type of "open ended in perpetuity agreement" which Digital has repeatedly said *it* would never agree to give to SellSignal.
- The transactions were not disclosed to all of the directors. The Services Agreement and Digital Loan did not exist at the time of the Board meeting where defendants contend they were approved. They were never disclosed to the Board in draft format, or at all. This non-disclosure was not only unfair to the minority shareholders, but also it violated SellSignal Bylaws and Delaware law. Neither the Services Agreement,

nor the Digital Loan, nor the Digital Invoices to SellSignal ever surfaced until after litigation was filed.

- Shareholder approval was sought through the issuance of misleading account of events, including a failure to disclose the pecuniary interest of certain shareholders to in the transactions sought to be ratified. (PX 27.)

With these facts, defendants cannot meet their burden of proving that the process was entirely fair to the minority shareholders.

**4. Delaware Law Mandates that the Services Agreement and Digital Loan are Void Ab Initio**

Defendants' failure to follow any valid process with respect to the Services Agreement and the Digital Loan goes beyond mere unfairness. The failure to obtain any form of Board authorization renders them void *ab initio*. *Moore Business Forms Inc, v. Cordant Holdings Corp.*, 1998 WL 71836 (Del. Ch. 1998); *Lewis v. Fuqua*, 502 A.2d 962 (Del. Ch. 1985).

*Moore*, like the instant case, involved a Board attempt to have shareholders ratify a corporate transaction that was never valid to begin with because the Board had intentionally excluded the input of a director that represented the interests of a minority shareholder. The "stifling or ignoring" of director input in *Moore* was achieved by the Board's waiting for Moore's representative to leave the room, and then surreptitiously taking Board votes adverse to the minority shareholder which were then kept out of the minutes of the meeting. The Court found that the board's deliberate exclusion of Moore's representative from the vote rendered it void *ab initio*:

> Because the decision to terminate the Strategic Alliance occurred at a board meeting of which Rogers was deliberately not given notice, the actions taken by the Holdings board to terminate the Strategic Alliance were void *ab initio*.

*Moore* at *7. Just like the board members in *Moore*, defendants here attempted to transact self-serving corporate business, without valid Board approval, for the purpose of stifling the input of the sole director not affiliated with Digital. Their acts here are void for the same reasons they were in *Moore*.

For all of the foregoing reasons, defendants have not carried their burden of proving the "entire fairness" of the process by which SellSignal was committed to the Services Agreement and Digital Loan.

**C. The Terms Were Not Entirely Fair to the Minority Shareholders**

In addition to proving fair process, defendants must prove the fairness of the terms of the agreements. In determining whether terms of a self-interested transaction are fair, the Court should determine whether they are similar to those which could have been reached through arms-length bargaining. *Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985). The terms here utterly fail that test. Digital has stripped SellSignal of all profits to date. It submits invoices that are never reviewed yet always paid in their entirety. Digital holds a security interest in the intellectual property that is SellSignal's only asset. (PX 38.) SellSignal is powerless to impose even minimal oversight on its own "vendor." Furthermore, all critical aspects of the Services Agreement and Digital Loan were left blank. No arms-length bargaining took place. The unfairness is manifest.

## II. THE SERVICES AGREEMENT AND DIGITAL LOAN CANNOT BE RATIFIED BY THE SHAREHOLDERS

### A. Shareholders Cannot Ratify Acts Never Authorized by the Board of Directors

After this litigation was filed, defendants attempted to obtain shareholder ratification of the Services Agreement and the Digital Loan pursuant to Section 144 of the Delaware General Corporation Law.[10] Section 144 was enacted to alter the rule, at common law, that directors were strictly prohibited from voting on any corporate transaction in which they had an interest. Accordingly, it permits interested directors to participate in meetings where the transactions are discussed, and permits their votes to count toward a quorum. 8 *Del. C.* § 141(a). But by no means does it obviate the need for a meeting or vote.

This is clear from the plain language of Section 144(a), which provides that:

> [interested director transactions] shall not be void or voidable . . . solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the transaction.

8 *Del. C.* § 144(a) (emphasis added). Similarly, Section 144(b) provides that:

> Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors . . . which authorizes the transaction.

8 *Del. C.* § 144(b) (emphasis added).

This well-settled construction of §144 was the basis for the concession in *Lewis vs. Fuqua,* 502 A.2d 962, 970 (1985), where the court stated:

---

[10]No ratification was even attempted with respect to the original Digital Loan (PX 38), or May 2001 Stock Option grants to Ghourdjian (32,000) and Finkelman (32,000), or any of the Invoices from Digital. (PX Group 25.)

> The Sanford Committee conceded that 8 Del. C. § 144 was not applicable here, however, because although the transaction may have been approved, the approval did not take place at a formal board meeting . . .

This aspect of §144 merely codifies Delaware common law. As the Court stated in *Moore Business Forms*, 1998 WL 71836, supra: "Delaware law recognizes that a board may ratify its prior acts . . ."; *see also, Hannigan v. Italo Petroleum*, 47 A.2d 169, 172 (Del. 1945) ("[W]hen an unauthorized act of a corporate officer is, after knowledge of the facts, duly and properly ratified by that authority which would have been competently empowered in the first instance, then the ratified act becomes a binding obligation of the corporation.") (Emphasis added.) But, in the case at bar, there is no evidence of any prior acts of the Board respecting the transactions in question. As such, ratification under Section 144 is inapplicable.

**B. The Attempted Ratification Was Not Made After "Full Disclosure"**

As the party asserting the defense of shareholder ratification, defendants bear the burden of proving that they disclosed all material facts. *Solomon v. Armstrong*, 747 A.2d 1098, 1116 (Del.Ch. 1999). In this case, the sole source of information provided to the shareholders was the Finkelman letter dated July 27, 2001. (PX 27.) Scrutiny of the specific representations made reveals that they fall far short of "full disclosure" and are replete with misrepresentations and omissions:

1. "[I]n the course of several *de facto* Board meetings, business meetings and telephone conferences between myself [Finkelman], Mr. Howington and Mr. Ghourdjian, during which the Services Agreement was discussed, including the December 1, 1999 Board meeting, both I [Finkelman] and Mr. Howington did in fact approve the Services Agreement."

(PX 27) (emphasis added). As discussed previously, this was false. No valid Board approval of the Services Agreement ever occurred, and certainly not at the December 1, 1999 Board meeting.[11]

2. "In the December 1st Board meeting, in particular, the discussions focused primarily on the new loan arrangement with Digital Convergence that all of us acknowledged was being provided by Digital Convergence going forward."

(PX 27) (emphasis added). Here, Finkelman misrepresents the facts to the SellSignal shareholders. The "new loan arrangement" discussed at, and recorded in the Minutes of, the December 1, 1999 meeting was not between SellSignal and Digital, but between SellSignal and Ghourdjian individually. (PX 8.)

3. "Because Mr. Ghourdjian was Digital Convergence's Chief Executive Officer, a member of its Board of Directors and a stockholder, he was considered an 'interested party' and could not vote on the proposed service arrangement and the related loan arrangement."

(PX 27) (emphasis added). There is no notation nor mention in the minutes of defendant Ghourdjian's "interest" in Digital, or that he was recusing himself, or that he abstained from voting. (PX 8.) In addition, the Minutes do not reflect how any of the directors voted. (*Id.*) Rather, the Minutes reflect that the only transaction authorized was to "prepare" an agreement between SellSignal and Mr. Ghourdjian personally, such an agreement was draft but never signed.. (PX 8; Ghourdjian, Tr. 315.)

---

[11]Indeed, defendants' claim of "de facto" Board approval here is also fatal to their cause:

> This phrase [de facto] is used to characterize an officer, a government, a past action or a state of affairs which must be accepted for all practical purposes, but is illegal or illegitimate. In

*Black's Law Dictionary* (emphasis added). Defendants, by using the phrase "de facto Board meetings," seemingly admit that such meetings were illegal or illegitimate.

> 4. "Although I [Finkelman] was and continues to be employed by Digital Convergence, I [Finkelman] have never owned, nor do I [Finkelman] currently own, any stock or other equity interest in Digital Convergence or Ceira Technologies."

(PX 27.) Here, defendant Finkelman does not disclose to the Shareholders that his $130,000 annual salary at Digital in the year 2000 was recouped from Finkelman's billings to SellSignal. Nor does he disclose that he was entitled to stock options of 3,000 shares of Digital. (PX 23.) Thus, his suggestion that he has no interest in the matters at issue was misleading in the extreme to the shareholders.

> 5. "I [Finkelman] have also never been, nor am I [Finkelman] currently, a director or an officer of Digital Convergence or Ceira Technologies. Therefore, both of the then current disinterested directors of the Company had consented to the services arrangement and the related loan arrangement with Digital Convergence."

(PX 27.) This statement is also incorrect. As shown above, Howington and defendant Finkelman, by their actions, had not conducted themselves in such a way as to <u>authorize</u> the "services agreement" and the related "loan arrangement" with Digital. Furthermore, Finkelman covered his salary at Digital with his billings to SellSignal, so he was not "disinterested."

> 6. "Brad Weirick of Gibson, Dunn & Crutcher LLP, outside counsel to the Company [SellSignal], attended the December 1st Board meeting, and he stated that he agrees with my [Finkelman] recollection of what was discussed and approved at that meeting."

(PX 27.) Regarding this statement, whatever Brad Weirick said was hearsay and, further, defendant Finkelman's recollection does not comport with the facts, as shown herein above. Indeed, defendants failed to call Mr. Weirick at trial to corroborate Finkelman's version of events, despite having identified him on their Witness List.

> 7. "Because Mr. Howington has asserted that he did not approve the service agreement with Digital Convergence, the current Board [defendants Ghourdjian and Finkelman solely] is circulating this Stockholder Consent for your consideration and approval. If approved, the Stockholder Consent will confirm that the service loan arrangement were duly authorized."

(PX 27.) With respect to this opinion expressed by Finkelman, which appears to be legal in nature, the conclusions arrived at are incorrect -- the transactions in question were not authorized by the Board and thus were beyond the reach of §144.

In sum, Finkelman's letter of July 27, 2001 was merely a commercial urging the stockholders to vote in his favor. It falls far short of "full disclosure" required for valid shareholder ratification.

**C. The Purported Ratification Did Not Obtain the Votes of a Majority of Disinterested Shareholders**

Defendants also bear the burden of proving that the ratification obtained affirmative votes of a majority of disinterested shareholders. *Fliegler v. Lawrence*, 361 A. 2d 218, 222 (Del. 1975). Determining whether a party is interested in a transaction is a question of fact that varies from case to case. *Cede & Co. v. Technicolor, Inc.* 634 A.2d 345, 363 (Del. 1993). The general guideline is that a person "is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).[12]

As of July 27, 2001, the SellSignal shareholders, and number of shares owned, were as follows:

---

[12]Although these decisions dealt with "interest" in the context of director votes, the same rationale applies to shareholder interest for purposes of shareholder ratification. Research has not revealed a different standard for "interestedness" under 8 *Del. C.* § 144.

| Shareholder | No. Shares Owned | Vote |
|---|---|---|
| Matthew Ghourdjian | 27,333 | recused |
| Digital Convergence | 10,453 | recused |
| Richard Finkelman[13] | 29,263 | voted to ratify |
| Robert P. Howington, III | 27,333 | voted against ratification |
| Greg Gentling | 10,974 | voted to ratify |
| Johnny Gonzales | 1,219 | voted to ratify |
| Paula Duffy | 10,969 | voted to ratify |
| Herbert I. Finkelman[14] | 4,386 | voted to ratify |

Of the shareholders who voted in favor of ratification, at least four had conflicts of interest:

Defendant Finkelman. As discussed above, Finkelman was not "disinterested" because (1) he personally executed the Services Agreement he voted to ratify; (2) he was named as a defendant in an action challenging the transactions; (3) he was hired by, and worked directly for, Ghourdjian and Digital, the beneficiaries of the transactions; and (4) Finkelman himself was the number one "Digital consultant" SellSignal paid for under the Services Agreement, incurring charges of approximately $140,000.00 for Finkelman's services alone in 2000. (PX Group 25.) As such, Finkelman clearly "stood on both sides" of the Services Agreement. He also benefitted from the Services Agreement in a manner "not shared by shareholders generally." *Rales*, 634 A.2d at 936.

Herbert I. Finkelman. Like the other shareholders, Herbert Finkelman received a copy of the Complaint naming his son as a defendant with his son's letter of July 27, 2001. (PX 27.) Absent evidence to the contrary, one must assume that his desire to insulate his son from legal liability made him predisposed to ratification. Strengthening this inference is the fact that by July 27, 2001, SellSignal as a business had abandoned its business model and was operating "in the red." The value

13 As trustee for the Richard Finkelman Irrevocable Trust. (PX 27.)

14 As "Cliff Ventures." (PX 27.)

of its stock was negligible. To say the least, defendants have not met their burden of showing that Herbert Finkelman was disinterested.

Greg Gentling and Johnny Gonzalez. Gentling and Gonzalez were Digital consultants. Their names appear on numerous Invoices, and the time summaries attached to Finkelman's letter include line items for their time. (PX Group 25; PX 27.) Thus, they were on "both sides" of the transactions. They also benefitted personally in a way not shared by all shareholders, in the form of billings to SellSignal which appear to exceed $50,000 each for the year 2000. (PX 27.)[15] Absent evidence to the contrary -- which defendants have not provided -- one cannot conclude that they were disinterested, particularly given the negligible value of their SellSignal stock. Thus, defendants have not met their burden with respect to these shareholders.

Excluding Richard Finkelman, Herbert Finkelman, Gentling and Gonzalez, as well as Ghourdjian and Digital (who recused themselves from voting), only two shareholders had no obvious conflicts of interest: Robert P. Howington, III (27,333 shares) and Paula Duffy (10,969 shares). With respect to Paula Duffy, the Secretary of SellSignal, defendants have presented no evidence to establish her disinterestedness.

In conclusion, even if shareholders could ratify acts that were not approved by the Board -- which they cannot -- and even if Finkelman had fully and accurately disclosed all material facts about the transactions and their "de facto" approval -- which he did not -- defendants still have not met their burden of showing that a majority of disinterested shareholders approved the transactions at issue.

---

[15]Calculating the exact amounts billed by each "consultant" is not possible, as certain invoices do not provide sufficient detail. (*See* PX Group 25.)

**D. All Future Transactions Between Digital and SellSignal Must Receive the Approval of the Minority Shareholders**

The ratification attempted here demonstrates the structural problem underlying this entire case: Because both of SellSignal's current directors (Finkelman and Ghourdjian) have ties to Digital, all future dealings between the two corporations will require the approval of the disinterested shareholders. 8 *Del. C.* § 144. Yet because most SellSignal shareholders are also Digital employees, with an interest in the transactions, "veto" power over such transactions will reside with the disinterested shareholders. *See Goodwin,* 1999 WL 64265 at *3 (noting that defendants' "voting rights gave it veto authority over any transaction requiring Shareholder approval.") For this reason, too, the Court should invalidate the transactions.

## CONCLUSION

Ghourdjian's testimony read into the record at trial strikes at the heart of this case:

> "Our [Finkelman and Ghourdjian] plan was never to make money off the [SellSignal] site."

(Ghourdjian, Tr. 292.) Ghourdjian is entitled to his view. He is also entitled, as a vendor, to seek to maximize defendant Digital's revenue. But as he admits from his attempted recusals, he and Digital are separate companies. Ghourdjian's views about how to allocate SellSignal's revenues should have carried no weight and been rejected by SellSignal's Board. Instead, they carried the day. Why? Because Ghourdjian's subordinate was on the Board and willing to do what was necessary to give Ghourdjian what he wanted for Digital -- Bylaws be damned. And, because nearly all of SellSignal's shareholders were Digital "consultants," almost no one minded. But not all. Therein lies the problem for defendants. Defendants Finkelman and Ghourdjian were legally obligated to protect,

and respect the rights of, all SellSignal shareholders, even the ones that did not work for Digital. That they clearly have not done.

WHEREFORE, for the foregoing reasons, plaintiff, Robert P. Howington, III, through his attorneys, and on behalf of the Shareholders of SellSignal, requests judgment on the derivative claims contained in Count V of Howington's Second Amended Complaint and a separate hearing on the relief to be granted SellSignal's Shareholders as a result of defendants' breaches of their fiduciary duties as officers and directors of SellSignal.

Dated: December 13, 2001

Respectfully submitted,

ROBERT P. HOWINGTON, III

By: ______________________
One of His Attorneys

Reuben L. Hedlund
Kenneth M. Sullivan
Jeffrey M. Glass
Sarah J. Deneen
HEDLUND HANLEY KOENIGSKNECHT & TRAFELET
55 West Monroe Street, Suite 3100
Chicago, Illinois 60603
(312) 441-8600

Robert P. Howington, Jr.
1663 North Bissell Street
Chicago, IL 60614
(773) 587-9033

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Kenneth M. Sullivan, one of the attorneys for Plaintiffs, hereby certify that I caused true and correct copies of the foregoing **Plaintiff's Memorandum of Law Supporting Derivative Claims Contained in Count V of Second Amended Complaint, Notice of Motion** and **Plaintiff's Motion for Leave to File Brief In Excess of Fifteen Pages *Instanter*** to be served via hand delivery upon:

Honorable Matthew Kennelly
U.S. District Court,
Northern District of Illinois
219 S. Dearborn
Room 1719
Chicago, IL 60604

Harold C. Hirshman
Gerald E. Fradin
Jason C. Rubin
SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606

Stephen J. Senderowitz
A. Jamie Schupp
Schwartz, Cooper, Greenberger & Krauss, Cht.
180 North LaSalle Street
Suite 2700
Chicago, IL 60601

on this 13th day of December, 2001.

Kenneth M. Sullivan